1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     RICHARD DASCHBACH, individually *
      and on behalf of others         *
5     similarly situation,            *  No. 1:22-cv-00346-JL
                                      *  March 2, 2023
6                       Plaintiff.    *  10:05 a.m.
              v.                      *
7                                     *
                                      *
8     ROCKET MORTGAGE, LLC, a         *
      Michigan limited liability      *
9     company,                        *
                                      *
10                      Defendant.    *
                                      *
11    * * * * * * * * * * * * * * * * *

12              TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE JOSEPH N. LAPLANTE
13

14    APPEARANCES:

15

16    For the Plaintiff:      Taylor True Smith, Esq.
                              Woodrow & Peluso LLC
16

17                            V. Richards Ward , Jr., Esq.
                              Law Offices of V. Richards Ward, Jr.,
18                            PLLC

19    For the Defendant:      Kyle Tayman, Esq.
                              Christina Hennecken, Esq.
20                            Goodwin Procter LLP

21                            Steven J. Dutton, Esq.
                              McLane Middleton
22

23    Court Reporter:         Brenda K. Hancock, RMR, CRR
                              Official Court Reporter
24                            United States District Court
                              55 Pleasant Street
25                            Concord, NH 03301
                              (603) 225-1454

1                    P R O C E E D I N G S

2          THE CLERK:  The Court has before it for consideration

3    today a motion hearing in civil case number 22-cv-346-JL,

4    Richard Daschbach versus Rocket Mortgage, LLC.

5          THE COURT:  All right.  So, left to right, Attorneys

6    Ward and Smith and Tayman, Hennecken and, of course, Mr. Dutton

7    in the back, right?

8          MR. DUTTON:  Correct.

9          THE COURT:  All right.  Look, by the way, ground

10   rules:  Anybody can speak; it doesn't have to be just one

11   person per side.  Anybody who wants to chime in, I'm happy to

12   listen.  I have a few questions to start, if that's okay.  I

13   just want to sort of get some ground rules down about what the

14   report is going to be and the rules of engagement here, and

15   then I'll just let you argue away.  I'm very happy to listen to

16   your presentations.

17         First things first.  It seems we have a disagreement

18   about applicable law, California or New Hampshire, but it also

19   seems like you seem to both recognize that there's really no

20   significant difference in the applicable law.  Is that true, or

21   am I assuming too much?

22         MR. SMITH:  For plaintiff, your Honor, yeah, I don't

23   think there's any difference in terms of the Motion to Compel

24   Arbitration regarding whether you apply New Hampshire law or

25   California law.

1      MR. TAYMAN:  We would agree with that as well, your

2  Honor.  One thing I would point out is I don't there's any

3  evidence in the record that could support the application of

4  New Hampshire law here.

5      THE COURT:  Okay.  So, is that your way of saying if I

6  cite New Hampshire law it's going to be an error?

7      MR. TAYMAN:  Well, your Honor, I think the evidence

8  that Rocket Mortgage has put forth shows that there was a

9  contract entered into in California.

10      THE COURT:  Understood.

11      MR. TAYMAN:  We know Mr. Daschbach's information ties

12  to New Hampshire, but we don't know where he was at the time,

13  because he put in no record evidence.  So, in terms of applying

14  New Hampshire law, I'm not sure there would be a factual basis

15  to do that, but we do agree it seems to be that there's a

16  consensus that, no matter California or New Hampshire, the

17  outcome and the factor analysis are pretty much the same here.

18      THE COURT:  Fair enough.  All right.  Let me see here.

19  Are we all comfortable with the fact that we're going to go on

20  the record we have and this oral argument?  Is anybody here

21  requesting an evidentiary hearing or anything like that at this

22  point?

23      MR. SMITH:  No, your Honor.

24      MR. TAYMAN:  Not for Rocket Mortgage, no.

25      THE COURT:  Okay.  You know, we've got these documents

1    in the record, these screen shots.  They are document numbers

2    15-11 and 15-12.  I've examined those very closely.  But

3    there's also this video demonstration, there's the video

4    itself, and there are representations of the screen shots in

5    the video, right?  What should I be relying on here, the screen

6    shots, or the video, or both, or what?

7              MR. TAYMAN:  I'm happy to take that, your Honor.

8              THE COURT:  Sure.

9              MR. TAYMAN:  And let me know if you want me to take

10   the podium.

11             THE COURT:  Oh, no, no.  Wherever you're comfortable.

12             MR. TAYMAN:  Sure.  We think both, your Honor.  The

13   screen shots -- what I think is undisputed here is that the

14   website was viewed on an iPad.  I'm not sure the make, model,

15   size, orientation, all that, so we wanted to make sure the

16   Court has an accurate representation.  This is what the screen

17   shot -- this is what the web page looked like, and this is an

18   experience of an iPad of how you go through that, because, of

19   course, it might differ depending on the device the plaintiff

20   used to visit it.  So, I think what it shows is this is

21   undisputed how it was constructed, how it looked, and this is

22   the experience of going through it and how a user would have

23   gone through the flow and what they would have seen as they go

24   through.  In the video, in particular, I think it points to the

25   fact that you can't get to that Submit button without bringing

1    the disclosures into your view.

2           THE COURT:  So, from your perspective, the video is

3    fair game for the record?

4           MR. TAYMAN:  Correct, your Honor.

5           THE COURT:  All right.  I'm sitting here on the bench

6    with my iPad, and I use it to look at a lot of the evidence in

7    this case.  Honestly, it didn't occur to me much, probably

8    should have, but it didn't occur to me much that what the

9    experience is, this was an iPad situation, I guess, and, as I

10   view the video on my iPad, is that roughly how it would appear

11   on the Internet, as far as you're concerned?

12          MR. TAYMAN:  That's my understanding --

13          THE COURT:  Okay.

14          MR. TAYMAN:  -- as it would relate to, you know,

15   Mr. Daschbach.  Again, all we know is the iPad, and some iPads

16   are smaller than others, some are bigger, but this is meant to

17   be a representation of how it would appear.

18          THE COURT:  I've got a pretty large iPad here that the

19   Court provided, but I remember once, when one of my kids was

20   young, you know those machines, like, with the crane at an

21   arcade where they pick up a toy?  He got an iPad out of one of

22   those machines, and this little iPad was in my house for years,

23   you know.  Sort of weird.

24          Anyway, I understand your position.  Thank you.  So,

25   as far as you're concerned, the video is part of the record,

1    the screen shots are part of the record, and you want me to

2    consider both.

3                THE TAYMAN:  Correct.

4                THE COURT:  Your position?

5                MR. SMITH:  Your Honor, I think you should focus on

6    the video, the docket number 15-5.  I think the video is the

7    most accurate representation.  Any time you take a screen shot

8    and start putting it in documents you have to make it deal

9    within the formatting.  I think if you look at I think document

10   number 15-11 I think the disclosure's actually more legible

11   than it actually is in the video record, so I would urge the

12   Court to base its decision on the video as opposed to any of

13   the screen shots.

14                THE COURT:  Okay.  Okay.  Those were my basic

15   questions, actually, and you've answered them straight, which I

16   appreciate, without a lot of qualification or dancing around.

17                All right.  It's your motion.  I'll let you go first.

18                MR. TAYMAN:  Thank you, your Honor.  Kyle Tayman for

19   Rocket Mortgage.  I will be arguing the Motion to Compel

20   Arbitration.

21                Your Honor, we submit that on the briefing it's clear

22   there's an undisputed fact that there was an agreement to

23   arbitrate here.  There was inquiry notice and assent, and

24   that's sufficient for the Court to compel arbitration and to

25   dismiss this case.  To the extent the Court would like to hear

1    on the Motion to Dismiss that we also filed, my colleague,

2    Ms. Hennecken, will present argument on that.

3              THE COURT:  Okay.

4              MR. TAYMAN:  I'm going to request a few minutes just

5    for rebuttal, your Honor.  I'm going to focus my argument on

6    the issues of the inquiry notice and the assent.  The rest

7    seems to be undisputed as to my client's, Rocket Mortgage's,

8    standing to enforce this arbitration agreement as well as the

9    fact that the claims here fall within the scope of the

10   arbitration.  We present those in our briefing, and, again,

11   they were undisputed.

12             THE COURT:  If it helps you frame your argument, just

13   for what it's worth, right, enforceability is going to come

14   down to two elements, right?  It's got reasonably conspicuous

15   notice and manifestation of assent.  I think Rocket Mortgage is

16   stronger, frankly -- I haven't prejudged it, but I think Rocket

17   Mortgage is stronger on manifestation of assent.  It's not a

18   done deal for me, and I'll have an open mind about it, but I'm

19   more focused, to be honest, on the reasonably conspicuous

20   notice aspect.  It doesn't mean you shouldn't address both.  I

21   just want you to know where my head is.

22             MR. TAYMAN:  That's helpful to hear.  I appreciate

23   that, your Honor.  I'm glad to tailor and focus the argument in

24   that regard and answer any questions along the way.

25             THE COURT:  Okay.

1      MR. TAYMAN:  So, your Honor, we submit that there's no

2   material dispute that the plaintiff twice agreed to arbitrate

3   his claims here through two separate visits to the website in

4   question.  That's the enhancedrefinance. -- the

5   refinance.enhancedrefinow.com website.  I'm going to refer to

6   it just as the "refinow" website, for shorthand.  And that his

7   agreement to the arbitration twice, again, requires the Court

8   compel arbitration and dismiss this case.

9      This is the same outcome that the Eastern District of

10   Michigan, Chief Judge Cox ordered in the Shirley versus Rocket

11   Mortgage case last year on a very similar factual record,

12   substantially the same screen shots.  It's a very almost

13   identical website, and also he relied upon a very similar video

14   experience to show the experience of a user going through the

15   website.

16      Factually, your Honor, just a little background.  So,

17   LowerMyBills is a sister company to Rocket Mortgage.  Rocket

18   Mortgage is an affiliated company.  We established that in the

19   declaration from Mitchell Viner.  LowerMyBills offers free

20   online websites that allow consumers in the market for a

21   mortgage to identify providers that can meet their needs, so

22   it's a free matching website.  Consumers can go get in the car,

23   drive down the street, go to a bank, they can get online, go to

24   different bank websites, call different banks, or they can use

25   services like LowerMyBills offers through the refinow website,

1    where you go on, put your information in and get matched to

2    consumers.

3            THE COURT:  I need you to slow down a little bit for

4    the reporter.

5            MR. TAYMAN:  Sure.

6            THE COURT:  Just moderate a little bit, please.

7            MR. TAYMAN:  Sure.  And consumers can be matched to

8    lenders who can meet their needs.  There's no cost to this, and

9    the only requirement is the consumer agree to the Terms of Use

10   for the website, which includes the agreement to arbitration.

11   It's more than a fair bargain.

12           Again, I think it's undisputed here that Mr. Daschbach

13   twice went to that website, first on September 13th, 2021 and

14   then again on December 20th, 2021 --

15           THE COURT:  Yeah.

16           MR. TAYMAN:  -- established in the Viner declaration.

17   Each time he went in he put his first name, last name, his

18   telephone number, his email address, the property address that

19   traces to public records that it's his, and, again, that he

20   used an iPad through a Safari browser to go there.   In

21   opposition, there was no declaration, no evidence submitted to

22   rebut any of that.

23           Your Honor, I think you framed it correctly that

24   there's two real issues here in terms of the inquiry notice and

25   manifestation of assent that courts focus on, that California

1   courts focus on when reviewing the enforceability of an online

2   agreement.  There's a few things as to the inquiry notice that

3   the Courts -- a few factors they look at.  They're not

4   exclusive, but generally as you look through the cases that

5   we've cited, the Ninth Circuit case in Nguyen, Lee versus

6   Ticketmaster, Dohrmann versus Intuit, the things they look at

7   are, one, is there explicit notice to the user of what action

8   they're going to take to bind them to the agreement?  That's

9   usually explicit disclosure right near the, it's called the

10  action button or the submission button.

11         Second, they look at the terms of use, where it's a

12  hyperlink, and whether that was conspicuously disclosed.  The

13  factors they look at there are is the font color offset from

14  the surrounding text, usually in blue, is it underlined,

15  capitalized, and clear to the user that there was a hyperlink

16  there that, if they want to, they can click and read the terms.

17         Third, they look to see whether the terms of use is

18  proximally located to the explicit notice and the submission

19  button.

20         And, last, the Courts may look at whether there's any

21  distractions, any distracting advertisements, videos, larger

22  pictures distracting or other font that takes the user's focus

23  away from the terms in the notice.

24         Your Honor, with your permission, we would like to

25  pull up 15-11, Exhibit 1 to the Viner declaration, to go

1    through it.

2            THE COURT:  Okay.

3            MR. TAYMAN:  So, your Honor, this is the website

4    that --

5            THE COURT:  Give me one second.  I want to get my

6    screen up.

7            MR. TAYMAN:  Sure.

8            THE COURT:  Okay.  We're good to go.  Thanks.

9            MR. TAYMAN:  So, this is the website that

10   Mr. Daschbach visited in his first visit, September.  We'll see

11   it slightly changes between this one and his December visit in

12   immaterial respects.  We would submit that this is the accurate

13   representation of how the website appeared.  Again, the video

14   submission, which I'm glad to get to in a minute, is to show

15   the experience of someone going through an iPad.  The video

16   submission, it is more challenging to make that an accurate

17   representation, and, as you're creating a video of the video of

18   the user experience, there is some degradation.  So, we would

19   submit that shows the experience; the screen shots show what it

20   looked like in terms of analyzing the notice and issues before

21   the Court.

22           THE COURT:  Why?

23           MR. TAYMAN:  Pardon me?

24           THE COURT:  Why?  You said the video shows the

25   experience.

1          MR. TAYMAN:  Correct.

2          THE COURT:  The screen shots show what it looked like.

3          MR. TAYMAN:  Correct.

4          THE COURT:  I'm trying to understand what that means.

5     The experience is what it looked like, right?

6          MR. TAYMAN:  In terms of capturing what the experience

7     is on an iPad, creating it into a movie video to submit as an

8     exhibit for the Court there is some degradation in quality.

9          THE COURT:  Okay.

10         MR. TAYMAN:  And I can tell you it's not very easy to

11    do this accurately.  We had to try a few times, because it's

12    very clear if you don't do it right it doesn't look anything

13    like the experience.  So, again, the video is supposed to show

14    the flow and how someone interacts with it with a finger going

15    through an iPad.  We think the screen shots here accurately

16    reflect how it was designed and presented.

17         THE COURT:  But this video still exists, right?  This

18    is still on the Internet?

19         MR. TAYMAN:  The website is.

20         THE COURT:  Yeah.  It still has the video, as far as I

21    know, doesn't it?

22         MR. TAYMAN:  The video --

23         THE COURT:  I went on the website and watched the

24    video.

25         MR. TAYMAN:  We submitted a video exhibit.

1          THE COURT:  I know.

2          MR. TAYMAN:  There is not a video on the website.

3          THE COURT:  Okay.  I might double check that, because

4     I thought it actually did.

5          MR. TAYMAN:  If it is, that's not how it appeared when

6     the plaintiff went to it.

7          THE COURT:  Understood.

8          MR. TAYMAN:  I know the website is active today.  We

9     have not put any record evidence that what it looks like today

10    is what it looked like in 2021, when the plaintiff went there.

11         THE COURT:  Okay.

12         MR. TAYMAN:  I do believe there would be some

13    differences.  I don't know if they're material or not, but,

14    again, that's not in the record today.

15         THE COURT:  Thank you.

16         MR. TAYMAN:  So, this is the page, the submission

17    page, after he's gone through the flow.  If we could go to

18    the -- this is question 14 of 15.  If we go to the last page,

19    so this is the submission, the final flow submission page.  You

20    can see he's instructed to put his first name in here, his last

21    name, and, as you go through the flow -- you can scroll up --

22    he puts in his phone number, he has the option to put in a

23    secondary phone number, and then there's the large See my

24    results! button in green.  Below there are the disclosures in

25    dark green font.  It's a contrasting color to the background,

1    so it's visible.  He's put on explicit notice that, quote, By

2    clicking the button above, you express your understanding and

3    consent, electronically via E-sign to the following.  So,

4    that's the explicit notice that the courts looked for in some

5    other cases, such as Berman was lacking where the Court did not

6    compel arbitration.

7           Next, the terms of use.  It is in contrasting color.

8    It's in blue font.  You can see it enumerated in number 2 in

9    this list.  It is underlined, indicating that it's a hyperlink.

10   It's also capitalized, indicating that you're going to be taken

11   to a separate document, documentation.  Again, these are all

12   the things the Ninth Circuit and California courts look for the

13   hallmarks of indicating that there is a hyperlink there.

14          In addition, your Honor, the terms of use are

15   proximally located to the See my results! button and the

16   explicit notice that, by clicking the button, the person is

17   agreeing to those Terms of Use.

18          Finally, there are no distracting ads, videos or

19   sound, no distracting imagery or other font off to the side to

20   distract the user away from this.

21          So, we think this has all the hallmarks of inquiry

22   notice, just as the Court found in the Shirley case last year.

23          If we could -- just quickly, your Honor, I'll put up

24   the next one for the December visit.

25          THE COURT:  Shirley is gray text over white

1    background, right?

2              MR. TAYMAN:  That's correct, your Honor.

3              THE COURT:  This is more like gray on gray.

4              MR. TAYMAN:  That's correct, your Honor.  And when

5    that comes up in the cases the courts aren't saying that the

6    same color font on the same background is disqualifying.  What

7    they're saying is the contrast is not sufficient enough to

8    allow the user to read it.  Here, the contrast between the gray

9    and the gray background, we do think it's sufficient enough

10   that it's clearly legible to the naked eye that it puts a user

11   on notice, and they can read it.  It is not in some other cases

12   gray on gray or a black on a dark gray such that you can't

13   actually see the font and you can't read it.

14             So, this is the -- can we go to the next page?

15             This is the December 1, your Honor, and you can see

16   the construct is pretty much the same:  first name, last name.

17   If you scroll down, there's slight differences here.  It allows

18   the user to select preferred method of communication.  There's

19   some slight differences in the disclosure language.  In the

20   interim my client had changed its name from Quicken Loans to

21   Rocket Mortgage, so Rocket Mortgage is clearly disclosed in

22   paragraph 1 there, whereas before it was identified as Quicken

23   Loans.

24             Your Honor, with your permission, I'd like now to turn

25   to the video.

1          THE COURT:  Please.

2          MR. TAYMAN:  So, this is, again, this is the

3    experience of a user on an iPad.  This is the landing page for

4    the website.  This is the first page where the user is informed

5    that, by going through this flow, they can be connected to a

6    lender about their refinance options.  I'm just going to go

7    ahead to the last page, your Honor, because that's the page at

8    issue.

9          THE COURT:  Yeah.

10          MR. TAYMAN:  If you want to back up a little bit to

11    1:56, and we'll play it from there.

12          So, again, this is how it looks when the user comes to

13    this last page.  As the user presses with their finger on the

14    fields, it's the common experience we've all had using these

15    types of devices -- we just lost it.  And now we're back.

16          THE COURT:  Now we're back.

17          MR. TAYMAN:  Okay.  So, as I was saying, as you click

18    on the fields to enter your information, it's the common

19    experience with the mobile device where the digital keyboard

20    comes up.  It obviously blocks some of the screen, but, as you

21    can see, as you press through the fields, the screen moves up,

22    and, again, in order to get the See my results! button you have

23    to, one, put the information in.  As you put the information in

24    the screen will scroll up.  And, two, to be able to get down

25    there, you have to scroll up.  So, by the time you get down,

1    you select your preference communication, the See my results!

2    button is fully in the user's field.  The disclosures there

3    below are visible.  Again, we would submit that the quality is

4    as reflected in the submitted document exhibits to the Viner

5    declaration.  There's slight degradation when we copy it over

6    to the video, but, again, we think all the hallmarks of notice

7    are here, the language required for assent is here, and so it

8    meets the qualifications under the law for an enforceable

9    online agreement.

10          Your Honor, I'd like to show just three other examples

11   from cases we submitted, and we submitted these exhibits to the

12   Court last week, that we think, again, support that there was

13   agreement to arbitrate here and the Court should compel

14   arbitration.

15          THE COURT:  Okay.

16          MR. TAYMAN:  First is from the Shirley case.  This is

17   Exhibit 5 in the binder that we submitted.

18          So, this was -- as you noted, your Honor, you

19   obviously are familiar with this.  This is what the Court in

20   Michigan enforced last summer.  It is another lowermybills.com

21   website.  You can see the disclosures are set up very similarly

22   in terms of the spacing below the button, the express

23   disclosure, the enumerated provisions the consumer is agreeing

24   to, the Terms of Use being in blue font, underlined, offset,

25   and, again, we have no distracting ads or videos.  And this was

1    enforced again by the Court last year.  The evidence was put in

2    by the same Mr. Viner here, LowerMyBills --

3              THE COURT:  Slow down.

4              MR. TAYMAN:  -- with the declaration before you.  My

5    apologies.

6              THE COURT:  It's okay.  We all do it.

7              MR. TAYMAN:  Next I'd like to turn to Exhibit 7 in the

8    binder we submitted.  This is from the <u>Hill versus</u>

9    <u>ActiveProspect</u> case.  It's in the Central District of

10   California from 2021.

11             This is not a LowerMyBills website, but it is a

12   partner of LowerMyBills, so it has LowerMyBills' disclosures,

13   it has the LowerMyBills Terms of Use, it is the same

14   arbitration agreement, and you can see the setup is much the

15   same.  The See my results! button is almost identical, instead

16   it's blue here.

17             In that case the user went through the flow once,

18   unlike Mr. Daschbach here, who went through it twice.  There

19   was a challenge to the sufficiency of the contracting.  Again,

20   there was a declaration from Mr. Viner to support the evidence

21   before the Court, and, upon reviewing the evidence, the Court

22   held that it was an enforceable clickwrap agreement.  We think

23   that's defensible.  I think there's no dispute here it's at

24   least a hybridwrap agreement of the type that courts routinely

25   enforce, and the court in the <u>ActiveProspect</u> case held that it

1    was indistinguishable from other Internet contracts routinely

2    enforced.

3         The last one I'd like to show you, your Honor, is from

4    the Rodriguez versus Experian case.  This is Exhibit 5 in our

5    binder.  This is a Central District of California 2015 case.

6    This is also a LowerMyBills website.  LowerMyBills was the

7    defendant in this case, and they moved to enforce arbitration,

8    and the court enforced it, holding, quote, This is exactly the

9    type of notice the Ninth Circuit in Nguyen required and

10   approved of.  As you can see, the disclosures here, again,

11   there's offsetting blue coloration of the Terms of Use, there's

12   an express notice to the consumer of the action by taking --

13   what would happen by clicking the button.  Those disclosures

14   are actually further down from the button than here.  But,

15   again, this shows a consistent experience with these websites,

16   all of which are by LowerMyBills or have the LowerMyBills

17   terms, where the Courts in California and outside of California

18   applying California law have consistently found they're

19   enforceable and held -- and compelled arbitration.

20        Last, your Honor, I just want to touch upon the cases,

21   some of the case law that the plaintiffs cite in their

22   oppositions, because we think, as we showed in the briefing,

23   it's distinguishable from the website here.

24        First, they cite to Berman versus Freedom Financial in

25   the Ninth Circuit.  There's a couple of distinguishing factors

1   that are starkly different from the website here.  The

2   hyperlinks there were not in contrasting font, they were not

3   underlined, they were not in capitalization to offset them from

4   the surrounding text.  The Court also found that there was no

5   explicit assent language informing the consumer of what action

6   they would take to agree to the terms, and there was

7   distracting design elements.  There were advertisements all

8   over the page, directing the user's attention away from a

9   clear, you know, vertical reading pane and looking at other

10  parts of the page.

11       Second, the opposition cites <u>Cullinane versus Uber</u>, a

12  First Circuit case.  There on the hyperlinks alone the court

13  found those to lack conspicuous disclosure.  The hyperlinks,

14  again, were not in blue, not underlined.  Instead of being

15  hyperlinks at all, they were, instead, in a gray, clickable

16  box, which, again, is far different from the type of disclosure

17  we have here in this website and the type that courts routinely

18  enforce.

19       Third, the plaintiff cites <u>Nicosia versus Amazon</u>, a

20  Second Circuit case.  There the terms of use were not adjacent

21  to the Place order, the Submit button.  It was, in fact, far

22  away, on the opposite side of the page.  The court also found

23  that there was no assent language near the button.  For those

24  reasons there was insufficient formation of a contract, and the

25  court did not enforce arbitration.  Again, none of those

1   factors are present here.

2          Last, two days ago the plaintiff submitted a

3   supplemental authority from the Williams v. DDR case, a

4   District Court case from California.  Again, the facts there

5   were far different from what's here.  There was zero evidence

6   in the record that the plaintiff even assented, even agreed to

7   the terms.  The assent language referenced a get-started button

8   that was not even existent on the web page, so there was no

9   ability for a manifestation of assent.

10          And then, as to inquiry notice, the court again found

11   defective the hyperlinks.  They were not in a contrasting blue

12   font to contrast them from the -- and they found that there was

13   distracting design elements and imagery below and next to the

14   disclosure, like in Berman.

15          And then they commented on the disclosure language,

16   that it was a very long, dense paragraph, very different from

17   what we have here, which is enumerated, easy for a user to

18   follow through and read and discern the different pieces.

19          So, in closing, your Honor, again, we think on the

20   record evidence before the Court it's undisputed that

21   Mr. Daschbach went to these websites twice, he twice went

22   through the flow, twice agreed to the terms, he clearly

23   manifested his assent, there was clear, explicit notice to him

24   of what he was agreeing to by taking the action, and that the

25   disclosures meet what the law requires, and therefore the Court

1      should compel arbitration.

2              Again, I'm happy to have a few minutes in rebuttal.

3              THE COURT:  First of all, nobody has to worry about

4      rebuttal or whatever; you're all going to get to say everything

5      you want to say today.

6              MR. TAYMAN:  Thank you.

7              THE COURT:  I have a couple of questions for you, but

8      I want to hear the other presentation first, and I'll circle

9      back.

10             MR. TAYMAN:  Thank you.

11             THE COURT:  I guess what I'm kind of -- maybe this is

12     what counsel will talk about a little bit, but I understand

13     your point that you think there's been some degradation in the

14     video from I guess what we would call the online experience,

15     right?  It's not something I can really -- it's something I can

16     understand and appreciate, but it's difficult for the Court to

17     then extrapolate how it would have looked online in a way I can

18     rely on for a ruling.

19             And here's why I ask, or here's what I'm wondering

20     about, and I'm going to listen to counsel, but just does the

21     summary judgment standard, where I'm supposed to draw some

22     inferences in favor of the nonmoving party, matter in that

23     comparison between screen shots and video or assumptions about

24     video and degradation from online?  I'll be asking you about

25     that when we come back.

1          MR. TAYMAN:  Glad to answer it.

2          THE COURT:  Okay.  Go ahead.

3          MR. SMITH:  Thank you, your Honor.  So, I want to

4   first start by addressing the video evidence, and then I'll

5   jump into the arguments regarding conspicuous notice as well as

6   unambiguous assent.  I think you can fairly analyze the video

7   when coming to your decision on this ruling.  I mean, Mr. Viner

8   submitted that as Exhibit 3 to his declaration.

9          THE COURT:  Oh, he's agreed that it's part of the

10   record.

11          MR. SMITH:  Yeah.  It's a true and accurate copy, and

12   if you go to the actual website I would say the video is a lot

13   more accurate than the screen shots.  Any time you put a screen

14   shot in a document -- I mean, they took issue with my screen

15   shots --

16          THE COURT:  You've got to slow down.

17          MR. SMITH:  Sorry.

18          THE COURT:  Try to speak up and slow down.  But let me

19   ask you a question.

20          MR. SMITH:  Yeah.

21          THE COURT:  I asked him about that, because I thought

22   -- I went to the website, and I definitely watched a video, but

23   it wasn't this video.  That's for sure.  I just wanted to take

24   a look.  And I know it's not part of the record.  I'm just

25   disclosing it.  I'm not going to rely on it.  But it sounds

1   like you're saying I can watch the video right now online.  No?

2           MR. SMITH:  You can go to the website, but it's not a

3   video.  It's a process you go through, right?

4           THE COURT:  But there used to be a video on the

5   website at the time your client went through it, right?  That's

6   your position?

7           MR. TAYMAN:  No, your Honor.

8           THE COURT:  No?

9           MR. TAYMAN:  May I?

10          THE COURT:  Yeah.

11          MR. TAYMAN:  Again, there was no video on the website.

12  It is a web flow, where you go through 15 different screens --

13          THE COURT:  That part I get.

14          MR. TAYMAN:  You have to click to get through, but

15  there was no video on the website.

16          THE COURT:  There wasn't like some click-the-arrow

17  video to watch?

18          MR. TAYMAN:  No.  I don't think that's in dispute.

19          THE COURT:  Thank you.  That's my own confusion.  You

20  just clarified it.  Thanks.  Okay.

21          MR. SMITH:  So, I just want to make a point that I

22  think the video is fair evidence, and the Court should rely on

23  it.

24          Now, when it comes to online contract formation in the

25  inquiry notice context, courts are in agreement that it

1   requires conspicuous notice and unambiguous assent, and when it

2   comes to conspicuous notice, it seems like the defendant in

3   this case wants to kind of sidestep Berman and Cullinane and

4   focus on these District Court cases, such as the Shirley case,

5   but, as we point out in our brief, the Shirley case is

6   distinguishable from the disclosure in this case.  For one, it

7   doesn't include one disclosure, it includes multiple

8   disclosures, and that played into the court's analysis as they

9   were determining whether or not the notice was sufficiently

10  conspicuous.  And then it also contained contrasting font

11  color; I think it was a white background with gray text.  If

12  you compare it to the instant disclosure, I think it's far more

13  readable than the disclosure in this case.

14          But I think there's also a fundamental issue with the

15  decision in Shirley, and I think that Shirley improperly

16  analyzed the Berman case, which is the standard that courts are

17  required to follow.  I think -- I think the -- well, the judge

18  in the Shirley case said, look, yes, the font was smaller, but

19  consumers didn't have to parse through loud videos, they didn't

20  have to parse through screen links to fine print.  But, if you

21  look at the disclosures in Berman they also didn't have to

22  parse through any loud videos, there was no fine print, the

23  disclosures were actually I think one sentence in each case,

24  and they were located above the button that the defendant

25  claimed was used to manifest assent.  I simply think Shirley

1   was wrongly decided.

2          But if the Court is looking for a case that's more

3   analogous, we filed a supplemental authority a couple of days

4   ago regarding the Williams versus DDR Media case.  In that case

5   the Court analyzed a similar website that involved gray font on

6   a gray background, and in that case, just like in this case,

7   the defendant was arguing that it was comparable to a website

8   that contained a white background with a contrasting font color

9   which I think was also gray.  The judge rejected that argument,

10  saying that the gray on gray makes it too difficult to read,

11  and then the judge also pointed out that, when you bury these

12  terms in fine print, it makes it all the more likely that

13  consumers aren't going to notice it or see it.  The same is

14  true here.  You have four paragraphs of fine print that you

15  have to read through that you're supposedly being bound to.

16          But what I would ask is that the Court look to the

17  standards laid out in Berman and Cullinane and conduct its own

18  analysis, because really it's not a technicality test; it's a

19  substantive test.  You should look to the form and the content

20  of the web page.

21          I guess the question, distilled in its most basic

22  form, is, when you look at the website are the terms presented

23  in a way that would draw a user's attention to them, or are

24  they presented in a way that would draw a user's attention to

25  something else?  And when you look at the disclosure at issue

1    here, it is the opposite of conspicuous.  If you just take the

2    disclosure itself, which, again, for the purpose of this motion

3    Rocket Mortgage really wants to focus on the actual disclosure,

4    but it has to be read within the context of the overall web

5    page.  It's well below the See my results! button and out of

6    sight for the typical users.  Each page prior to that has

7    substantially larger font, and the page on which you submit

8    your information uses substantially larger font and an outsized

9    button to draw users' attention up above, to where the actual

10   terms are located, and then you actually get to the terms, and

11   they are printed in tiny gray font on a gray background.

12   They're barely legible to the naked eye, and they're smaller

13   than not just all the text on that page, all the text on that

14   website.  That's really problematic.  That's not a mistake,

15   your Honor.  If you watch how you go through the process --

16            THE COURT:  What do you mean it's not a mistake?

17   You're asking me to draw an inference of intentional -- of an

18   effort to conceal information.  How does that fit in?

19            MR. SMITH:  Sure.

20            THE COURT:  Is it just an objective observation, or is

21   it really -- am I supposed to be, like, ascertaining and

22   inferring, you know, ill intent?

23            MR. SMITH:  No, I don't think you have to infer

24   intent.  I'm just pointing out, like, if you look at the

25   process, they ask for users' credit information, they ask for

1    users' address, they ask for I think whether or not they have a

2    VA loan, and all this they do is sliding scales, large buttons,

3    colorful emoticons and substantially larger font, but what this

4    demonstrates is that the website developer understands exactly

5    what they need to do to bind a consumer, but when it comes time

6    to disclose the disclosure and they seek to bind with the

7    arbitration agreement at issue all of a sudden that font size

8    is reduced to the smallest font on the entire website.  I don't

9    think there's an intent, but I think it calls into question

10   whether or not it was designed in a way to draw a user's

11   attention to it, or whether or not it was designed in a way to

12   draw a user's attention away from it, and that's really the

13   relevant inquiry.

14          And then there is the submission process itself.  Once

15   again, Rocket Mortgage wants to focus on the last page, but I

16   think it needs to be read in conjunction with all prior 15

17   pages.  This was a process.  Rocket Mortgage -- or LMB asked

18   consumers for information and promised them that they would get

19   rates and helpful information regarding their loans.  For 15

20   pages users submitted information, and they were conditioned to

21   click the Next button to continue moving on in the process.

22          But even if you focus on the last page, your Honor,

23   it's arguably the worst page.  It's riddled with

24   misinformation.  Right at the top it says, Great news!  Your

25   results are ready to view.  But that's a misstatement.  There

1    will never be any results on that website.  And then it says,

2    Complete this final step to see your potential savings!  But,

3    once you complete that final step, there are no results or

4    savings for you to review.  It also asks you to click a button

5    called See my results!, but, again, you click that button there

6    are no results; there are just links to third-party websites.

7         I think this has to be taken into consideration,

8    because, when you're looking at whether or not you're trying to

9    draw a user's attention to make it noticeable to the terms or

10   the process, I think it's incredibly misleading to mislead

11   individuals into thinking, Look, you're going to get helpful

12   information about the loans, just complete this process, you're

13   almost done.  It's not putting people on notice that, hey, this

14   process is actually to acquire your information to be sold to

15   third parties and there's all these litany of details regarding

16   what you're bound to, and a lot of them don't even relate to

17   telemarketing.  I mean -- well, sorry, don't relate to

18   telemarketing for mortgage purposes.  They can sell your

19   information to solar companies.

20        THE COURT:  Oh, yeah, I'm aware of all of that.  Yeah.

21        MR. SMITH:  They can check your credit using this.

22        So, I think the issue here is that you have to read

23   the website in the context of the overall design, and, when you

24   do that, you see that this disclosure is not conspicuous.

25        As the court in Berman pointed out, website users are

1    entitled to presume that important provisions that the website

2    developer seeks to bind them to must be conspicuously

3    displayed, not buried in fine print.  This disclosure is the

4    definition of burying terms of an arbitration agreement in fine

5    print.

6              I do want to turn to, briefly, unambiguous assent and

7    just address that with a few points.  I think you indicated

8    you're leaning towards finding that that is unambiguous assent,

9    but I would like to point out two things.  Number one is the

10   placement of the disclosure compared to the placement of the

11   See my results! button.  On its own See my results! does not

12   suggest to any reasonable user that you would be manifesting

13   assent to any agreement.  So, if you look at the other cases, a

14   case cited by the defendant, I think it was in the Second

15   Circuit in their reply brief, the button said Accept, right?

16   In a lot of these cases where you see Accept, Place order,

17   Create account, that triggers to a reasonable user that you're

18   agreeing to something, you're agreeing to take a step, right?

19   But when you see See my results! you're not expecting that's

20   the final step.

21             THE COURT:  That's true.  I agree with you on that.

22             MR. SMITH:  Yeah.  You're accepting to move on.

23             THE COURT:  The button analyzed as a button.

24             MR. SMITH:  Right.  And then there is the issue of the

25   fact that it's out of sight.  If it's not conspicuous and you

1    don't even see the By clicking this button, how can you say

2    that they understand that that has manifesting assent?

3            And then there is the issue of vagueness.  There are

4    two buttons.  It's See my results! or Back.  The defendant

5    counters the Back isn't a button.  I think they say it's a

6    clickable text.

7            THE COURT:  Slow down.

8            MR. SMITH:  Sorry.  That sounds like a button to me.

9    The reality is that it's not clear, and the onus shouldn't fall

10   on the website user to determine which action they must take.

11   This can be solved simply, your Honor.  By clicking the Get my

12   results button you agree to the terms, and it should be

13   displayed in a font size and right next to the See my results!

14   button so individuals understand that they're taking an

15   affirmative step to bind themself to something that is legally

16   significant.  That's not present in this case.

17           So, unless you have any other questions, I would ask

18   that the Court deny the Motion to Compel Arbitration.

19           THE COURT:  Thanks.

20           Go ahead, sir.

21           MR. TAYMAN:  Sure, your Honor.  Let me start with the

22   point you raised when I sat down regarding the video.

23           THE COURT:  Yeah.

24           MR. TAYMAN:  I think it's very clear that, if you are

25   relying on the video alone, it meets the summary judgment

1   standard, and it's consistent with the case law that we put

2   before you.  That includes the Berman case.  We're not running

3   away from it.  We put the exhibit in front of you.  We are

4   happy to pull it up to show the drastic differences between

5   what's insufficient in Berman and that they're not here.  So,

6   we think there is no issue between the screen shots and the

7   video.  We do think the screen shots more accurately capture

8   what the page looked like, but we are not hiding or running

9   away from the video.  We think it's sufficient on the summary

10  judgment standard that you can grant our motion and compel

11  arbitration.

12        I'd also note that the video that was submitted by

13  Mr. Viner from the time of his declaration of the experience,

14  again, going through the iPad, that at that time plaintiff put

15  forth no evidence of a different experience or a different view

16  of their own.  To the extent they're speaking about their own

17  experience about the website today, again, as your Honor noted,

18  that's not in the fact record before the Court.

19        Going to the other points that my colleague raised,

20  with respect to Shirley, yes, the user there, there were two

21  different places where the user assented to the terms.  That

22  was not dispositive to the court's ruling.  If you read the

23  decision, the court notes it but doesn't note that, oh, because

24  of the two visits therefore I'm going to find there was

25  agreement to arbitrate, whereas I wouldn't have if there was

1    one.

2          Moreover, it's no different than the facts here.  In

3    fact, Mr. Daschbach had more of an opportunity here because he

4    twice went back to the website, twice went through those

5    15-page photos, so he had two opportunities to understand what

6    he was doing.

7          THE COURT:  Yeah.

8          MR. TAYMAN:  My colleague also said that Shirley

9    incorrectly analyzed Berman with respect to the videos.  Again,

10   we explain this in our reply brief.  That's a misreading of the

11   Shirley decision.  As I'm sure the Court can see for itself,

12   the judge in Shirley was addressing two cases by the

13   opposition, one of which was Shultz, the other one's name is

14   escaping me at the moment, where there were videos present,

15   there was distracting ads, and that's the part of the opinion

16   the court is very clear he was addressing those aspects, was

17   not suggesting that there were videos in Berman.

18          With respect to the Williams-DDR case, I think I

19   already addressed that.  I think if you look at the screen shot

20   there it's, again, drastically different than what we have

21   here.  It didn't have the hyperlinks, it didn't have the blue

22   hyperlinks, and there was distracting design elements, and the

23   terms of use were buried in the middle of long (ph) font,

24   again, not offset and enumerated, like we have here.

25          My colleague also mentioned that the website here

1     draws the user's attention to somewhere else.  I'm not sure

2     what he was referring to, because on this flow it's a very

3     vertical flow, where you just read straight down, again, unlike

4     what you see in Berman and these other cases.  There is nothing

5     off to the side, no pictures or images that say, as was the

6     issue in Berman, Sign up for a free gift here.  It's very clear

7     what the user is doing and what they're going through.

8          With respect to the font size, there is no court case

9     that we are aware of and is not in the record before the Court

10    that says, just because the disclosures are smaller than

11    surrounding font, that's disqualifying.  Berman notes that, you

12    know, to the extent the font size is equal size, that's

13    supportive of assent, but consistent with the Nguyen case and

14    the Intuit case and the Lee versus Ticketmaster case, there is

15    a long precedent under Ninth Circuit law and California law

16    that smaller font size is acceptable for terms of an online

17    enforceable agreement that the disclosures were smaller than

18    the other surrounding text.  The issue is, is it sufficiently

19    noticed -- sufficiently conspicuous to the user, and we would

20    submit that it is here, consistent with the examples we've put

21    before the Court.

22          As to the prior flow pages, the prior 15 pages, again,

23    they raise this issue, we addressed it in reply, there's no

24    history in the cases where you look at the other pages to

25    determine whether or not there was a contract, enforceable

1    contract, on the last submission page.

2           THE COURT:  But just as a matter of contract law do

3    you really think there's any problem with evaluating the

4    conspicuousness in light of the whole experience as opposed to

5    one screen?  What's the problem with that?

6           MR. TAYMAN:  Well, your Honor, I would just submit

7    that that's not how courts treat this when they're looking

8    about whether or not there was an enforceable agreement,

9    because they're looking at the moment of --

10          THE COURT:  Is there authority that says they can't

11   treat it that way?  I understand what your point is.  You

12   haven't seen it done, but that's different than you can't.

13          MR. TAYMAN:  I'm not aware of authority that you

14   can't, but I think there is a reason why you don't see cases

15   where courts are looking at it, because what you're agreeing to

16   on that page, nothing on that page informed Mr. Daschbach that,

17   Hey, you're agreeing to terms five pages ago or six pages ago.

18   That's not what the contract was.  The contract was that page

19   in front of him that, Hey, you're going to get your free

20   results, what he was told on page 1, which was connected to a

21   lender, a lender who can meet his options, and here are the

22   terms to get your free results.  Give us your contact

23   information.

24          In terms of getting calls, it's right there on number

25   1 that he is explicitly consenting to be contacted.  That's a

1   long paragraph, because, unfortunately, there's just been a

2   proliferation of these types of TCPA cases, and under the law

3   in many states, TCPA laws from many different states, you now

4   have to put this language in.  So, they would love not to have

5   that long paragraph there, but this is required as a matter of

6   law.  So, it's very clear that he's agreeing to these things.

7   And, again, he was told, as we saw on the video, told on page

8   1, You're going to be connected to lenders.

9          Now, as to the results, again, I don't think that's in

10  the fact record.  Nothing -- we've gone into that.  I know it

11  shows up in the video, but what he's being told, and we can

12  pull it up again, if your Honor would like to see it, is these

13  are the lenders that you're being connected to, so he knows who

14  is going to be contacting him per his agreement, and enumerated

15  at paragraph 1 there under the disclosures that he's consenting

16  to receive calls, and, again, my client is explicitly called

17  out in the blue font and underlined.

18         Your Honor, you also mentioned and you commented on

19  that users may also agree to other types of calls, like solar.

20  If you look -- if you read the disclosures -- I'm looking at

21  the -- actually, if you don't mind, I'll just pull it back up

22  so we can all look at it together.

23         THE COURT:  Yeah.

24         MR. TAYMAN:  So, this is the second screen shot from

25  the December visit.  What it says in number 4, it says, If you

1   selected above, you consent to be matched up to three

2   additional providers about solar, home improvement, et cetera.

3   So, that's not a, You are getting contacted.  It is in these

4   flows the user may have the option to select that, and, if you

5   do select that, then you will hear from those providers.  It is

6   not that you're going to get bombarded with calls from solar

7   services because you wanted to find out about a mortgage.  You

8   only get those calls if you opt in, and, as it says, it's only

9   from three providers.

10          Finally, your Honor, with respect to the nomenclature

11   of the button itself, again, we've showed numerous examples

12   where these buttons with different terms have been enforced.

13   There is no holding that it must be Accept or I agree.  There

14   is no requirements.  What is required is that the user is given

15   explicit notice of the action they must take to agree, and here

16   they're told that, clicking the button above.

17          I would note the case cited by my colleagues, the

18   Bel Air case from New Hampshire Supreme Court, what they say

19   the issue here is not whether the document is a paradigm of

20   draftsmanship.  We are not here to determine whether this is

21   the best contract in the history of contracts.  We're looking

22   at whether under California law this is a sufficient online

23   enforceable contract, and we think we've demonstrated numerous

24   examples where this is entirely consistent with binding law

25   from California that meets all the hallmarks and is

1   enforceable.

2           Your Honor, if you have any more questions, I'm glad

3   to take them; otherwise, again, we would ask the Court to

4   compel arbitration.

5           THE COURT:  I understand.  You want the last word on

6   arbitration?

7           MR. SMITH:  I just want to make one last point, your

8   Honor.

9           THE COURT:  Sure.

10          MR. SMITH:  There's just one issue that I forgot to

11  address in my initial argument.

12          There are attempts to distinguish the Williams case.

13  I think it is inaccurate.  They're saying it dealt with assent.

14  It did deal with assent, but it also dealt with conspicuous

15  notice.  The courts found it violated both prongs of the Berman

16  standard.  So, I just want to point out that, even if the Court

17  finds that there is assent in this case, Williams is still

18  applicable for the purposes of analyzing whether or not the

19  disclosure is conspicuous.

20          Unless you have any questions, I have nothing further.

21          THE COURT:  No.  Okay.  We can move on to dismissal.

22          Go ahead, Counsel.  I know you want to be heard on

23  this.  I'll tell you what I'm struggling with on this is this

24  idea that I'm supposed to rely on the original complaint and

25  the facts in the original complaint.  The law supports that?

1          MS. HENNECKEN:  Yes, your Honor.  This is Christina

2     Hennecken for Rocket Mortgage, and I can start with your

3     question.

4          THE COURT:  Yeah.

5          MS. HENNECKEN:  And I think we cited a couple of

6     different cases in our briefing where courts have consistently

7     looked at original pleadings if there were facts pled and they

8     can be considered as admissions.

9          THE COURT:  Sure.

10          MS. HENNECKEN:  And one of the -- I can point to a

11     couple of them.  One of the cases we cited was Phillips versus

12     Murphy.  It's a District of Massachusetts case, where the court

13     had a due process claim in front of it and was considering a

14     motion to dismiss an amended complaint and looked back at the

15     original complaint to assess whether a certain fact had been

16     pled and considered that in dismissing the due process claim.

17          Another case we cited was, I believe, Lifchits versus

18     National Insurance (ph), another District of Massachusetts

19     case, showing that this was appropriate.

20          In our case the plaintiff here has -- he admitted he

21     was online looking for information about a mortgage and that he

22     went through a process and submitted the phone number, and, as

23     alleged in the original complaint, he said he made a submission

24     of his personal information and shortly thereafter received

25     calls from Rocket Mortgage about a mortgage.  So, the plausible

1    conclusion there is that Rocket Mortgage called him as a result

2    of his online activity.

3          I'm happy to answer additional questions or just start

4    from Counts One and Two and proceed from there.

5          THE COURT:  You proceed however you're comfortable,

6    but, look, I've been through it in trial situations and summary

7    judgment situations where people disagree about whether I can

8    use complaints as admissions.  I've seen people confront

9    witnesses with them in court and other lawyers object.  I agree

10   with your proposition that that complaint, the original

11   complaint, certainly is full of admissions of party opponent,

12   right?

13         MS. HENNECKEN:  Mm-hmm.

14         THE COURT:  But there seems to be case law applicable

15   to this particular situation that says we shouldn't focus on

16   that, as a matter of fact, maybe even that we can't, and I

17   guess that's what I'm struggling with, right?  Like, I can use

18   it in summary judgment, but I don't think I can use those

19   admissions under Rule 12(b), because I'm supposed to use the

20   operative complaint.

21         Do you follow what I'm saying?

22         MS. HENNECKEN:  Yes, your Honor, and the two cases I

23   just cited were considered on 12(b)(6) motions, and there's

24   additional authority we cited.

25         THE COURT:  Did you say it was Murphy?  Is that what

1    you said?

2          MS. HENNECKEN:  Yes, your Honor, and Lifchits was the

3    second case.

4          THE COURT:  Okay.

5          MS. HENNECKEN:  And there's actually a third case we

6    cited called Jeranian versus Dermenjian.  I'm not sure I'm

7    pronouncing that incorrectly.  It was a District of Rhode

8    Island case, and in that case the court actually considered

9    facts and admissions in different filings from the parties,

10   because he was considering a motion to dismiss a counterclaim,

11   and there had been lots of briefing by the parties on other

12   issues, and he considered those previous filings in dismissing

13   that counterclaim as admissions of fact.  In that case the

14   Court also considered statements the parties had made in

15   filings in a separate case because they're in the public record

16   and considered those to be admissions that he could take notice

17   of.

18         THE COURT:  Okay.

19         MS. HENNECKEN:  So, I'd like to -- well, first of all,

20   Rocket Mortgage's position is the Court should dismiss the

21   amended complaint and dismiss all six counts for failure to

22   state a claim, and I will start with Counts One and Two,

23   because I think the law is well settled that both those counts

24   should fail for failure to state an essential element of those

25   claims.

1         So, in Counts One and Two plaintiff has alleged that

2    Rocket Mortgage violated the Telephone Consumer Protections Act

3    auto dialer provision or an automatic telephone dialing system,

4    or ATDS, and to state a claim under that provision you have to

5    allege that the defendant placed calls using that technology

6    without your consent, and the problem here is he hasn't pled

7    facts plausibly showing that that technology was used, so he

8    hasn't met an essential element, and that's, in my opinion, and

9    I think the courts' opinion or general consensus is that it's

10   well-settled law.  So, in the statute itself the term "ATDS" is

11   defined, and it's defined to mean equipment which has the

12   capacity to store or produce telephone numbers to be called

13   using a random or sequential number generator.

14        And there was a Circuit split on this issue, and, as

15   your Honor knows, the Supreme Court spoke to this in the

16   Facebook decision and stated that an ATDS must, in fact, have

17   the capacity to either store the telephone number using a

18   random or sequential generator or producing a telephone number

19   using a random or sequential generator.

20        THE COURT:  You've got to slow down when you're

21   reading.  We all read faster than we speak.  We've got to be

22   careful here so we can have a record.

23        MS. HENNECKEN:  Okay.  Yes, your Honor.  So, on the

24   facts pled here all plaintiff has alleged is the conclusion

25   that Rocket Mortgage used an ATDS, and, in fact, the facts that

1    are pled are totally inconsistent with the use of random or

2    sequential number generators, because plaintiff pleads that he

3    received targeted phone calls.  We know that he alleges four

4    phone calls in September 2021, one text in September '21 and

5    two texts in March 2022, and he pled that he received these

6    after submitting his phone number, and the only plausible

7    conclusion we can draw here is that Rocket Mortgage received

8    the phone number and then placed the calls and not that Rocket

9    Mortgage randomly or sequentially created that phone number.

10        So, that's the essential problem with Counts One and

11   Two.  I'm happy to speak to the authorities that have rejected

12   plaintiff's position in his opposition that you don't need to

13   randomly or sequentially generate the number.  I think that has

14   been uniformly rejected by the Eighth Circuit, by the Ninth

15   Circuit three times now, and I think we've provided a pretty

16   good laundry list of District Court opinions rejecting that

17   position.

18        And I understand your Honor is concerned with

19   considering the original pleading, but, even considering just

20   the amended complaint, there's nothing suggesting that Rocket

21   Mortgage randomly or sequentially generated his phone number.

22   It's just a conclusory allegation, which isn't sufficient under

23   12(b)(6).

24        THE COURT:  What's the citation on Murphy again?

25   What's that again?

1          MS. HENNECKEN:  Yes, your Honor.  One second.  It's
2    Phillips versus Murphy.
3          THE COURT:  Yeah.
4          MS. HENNECKEN:  It's 2003 Westlaw 22595198.
5          THE COURT:  Okay.  2003.
6          MS. HENNECKEN:  Westlaw 22595198.  And then -- do you
7    want the other cases?
8          THE COURT:  No.  Thank you, though.
9          MS. HENNECKEN:  And I think the idea there is it's
10   fine to look at the facts pled in the original complaint,
11   especially when the facts in the amended complaint are sparse,
12   and that's supported both by Murphy and the Lifchits case.
13         And then the other case I had cited, the Jeranian
14   case, goes to the point that it's fair for the Court not to
15   turn a blind eye to other admissions or statements of fact the
16   parties have made in filings on the record.
17         So, I'd like to move on to Count Three, which is a
18   regulatory claim.  So, in Count Three the plaintiff alleges
19   Rocket Mortgage violated --
20         THE COURT:  Wait a minute.  I think I want to pull up
21   the complaint.  See, the amended complaint talks about ATDS,
22   paragraphs 8, 9 and 10, as far as I can tell.
23         MS. HENNECKEN:  Let me pull that up.
24         THE COURT:  They seem to allege it.
25         MS. HENNECKEN:  Okay.  I see where you are, your

Honor.  Your Honor, what plaintiff has done in paragraph 8 is
parroted the language from I think the Facebook opinion, saying
-- well, actually, this isn't even a quote from the Facebook
opinion -- but he's saying that the hardware and software used
by defendant has a capacity to store, produce --

THE COURT:  Slow down.  You've got to slow down when
you're reading.

MS. HENNECKEN:  -- and dial random or sequential
numbers *en masse* in an automated fashion, but I would say that
is actually parroting case law from before the Facebook case.
This was a consistent language that was used.  And in Facebook
the Court said, No.  You have to allege facts showing that the
number was randomly or sequentially generated.

THE COURT:  What if the facts are the same as the case
you're parroting from?  I mean, what's wrong?  You're still
alleging facts, and that allegation was found to be specific.
You lost me.  I understand you have to plead facts.

MS. HENNECKEN:  Yes, your Honor, and I think what he's
alleging here is just a conclusion.  There's nothing about --
he alleged he received a handful of phone calls, and there's
nothing about the facts specific to the plaintiff that suggest
anything about the hardware used by defendant.  This is
completely speculative.

THE COURT:  Well, you can speculate on facts in the
complaint.  That's totally permissible.  You might get blown

1    out at summary judgment.  I get it.  But read those paragraphs

2    to me again slowly, please.

3           MS. HENNECKEN:  In paragraph 8 he says, In making the

4    autodialed calls at issue in this complaint, defendant and/or

5    its agents utilized an ATDS.  Specifically, the hardware and

6    software used by defendant and/or its agents has the capacity

7    to store, produce, and dial random or sequential numbers

8    *en masse*, in an automated fashion.  And then he goes on to say,

9    On information and belief, the dialing system used to place the

10   calls at issue has the capacity to use a random or sequential

11   number generator in the process of storing numbers from a

12   pre-produced list for texting and calling at a later date.

13          I can go on.

14          THE COURT:  I gotcha.  Thank you.

15          MS. HENNECKEN:  So, I think the problem with these

16   paragraphs here is that they're implausible, and the standard

17   is plausibility.  He can say speculative things, but if he

18   hasn't shown facts that plausibly show an ATDS was used his

19   claim fails, and here he's only alleged that he went online,

20   submitted his phone number and then received four phone calls

21   about a mortgage.  So, there's nothing plausible there to

22   support the statement that the number was randomly generated,

23   your Honor.

24          And we cited authority saying that targeted phone

25   calls are inconsistent with the use of an ATDS.  So, even

1  setting aside the original pleading, in the amended complaint

2  plaintiff says he received, I believe, a phone call and an

3  email and another phone call from the same Rocket Mortgage team

4  member.  So, this person -- it's implausible to say that this

5  banker was randomly or sequentially generating his phone number

6  if it's the same person he's been speaking with.

7           THE COURT:  All right.

8           MS. HENNECKEN:  Moving on to Count Three, so in this

9  claim plaintiff alleges that Rocket Mortgage violated a

10 regulatory provision by the FCC, 47 C.F.R. Section 64.1200(c),

11 by initiating telephone solicitations to plaintiff while his

12 phone number was registered on the National Do Not Call

13 Registry.  So, the problem with Count Three is an essential

14 element here is to allege telephone solicitation, and it's, in

15 fact, to allege at least two telephone solicitations.

16           And, again, it's Rocket Mortgage's position that

17 plaintiff has pled and that the Court may consider that

18 plaintiff has pled that he provided his phone number.  And,

19 your Honor, we just went through the whole video flow and the

20 15-page process, and the provision of his phone number -- it's

21 our position that he invited these calls.

22           And the FCC has defined "telephone solicitation" to

23 explicitly exclude calls made with invitation or permission,

24 and the FCC has stated that persons who, I'm quoting, knowingly

25 release their phone numbers have, in effect, given their

1    invitation or permission to be called at that number.

2         So, based on this, it's our position that plaintiff

3    invited the calls.  He's therefore failed to plead -- and on

4    the face of the pleadings he's invited the calls; he's failed

5    to plead telephone solicitations.  In the opposition brief

6    plaintiff's main response is that consent is an affirmative

7    defense under the TCPA, so I'd like to address that for a

8    moment.

9         THE COURT:  Yeah.

10        MS. HENNECKEN:  The only authority plaintiff cites

11   there is about a different TCPA provision.  And we said this in

12   our briefing.  I just want to emphasize it.  He points to no

13   authority saying he doesn't have to plead an element of his

14   claim, and here telephone solicitations is an element of his

15   claim, and he doesn't -- and the case law he points to is about

16   the ATDS provision, where some courts have said consent is an

17   affirmative defense to making autodialed calls.

18        I'd like to briefly move on to Count Four.  So, this

19   is another regulatory claim, and, although it was unclear from

20   the pleadings, I think plaintiff agrees that this is a claim

21   brought under provision (d) of the same regulation, another (d)

22   and (c) regulation, and I would like to speak to a threshold

23   issue based on the notice of supplemental authority we filed

24   just yesterday.

25        THE COURT:  Yeah.

1          MS. HENNECKEN:  So, the SEC published just a few days

2     ago, a week ago today, a notice of proposed rulemaking about

3     these (d) and (c) regulations, and in that notice the FCC said,

4     We have never stated that they apply to text messages, and the

5     proposed rulemaking is to amend it to make it apply to text

6     messages.  So, based on this notice, the two text messages in

7     March and the text messages in September aren't covered or

8     governed by this regulation.  And Count Four is premised solely

9     on two text messages.  The allegation is Rocket Mortgage didn't

10    implement the proper procedures to maintain an internal

11    do-not-call list, and that claim is premised on these two texts

12    in March, but if texts aren't governed by the regulation, then

13    there's no basis for this claim to proceed.

14          THE COURT:  Understood.

15          MS. HENNECKEN:  There are other reasons this claim

16    fails, even setting aside the notice.  We think that's

17    sufficient for dismissal.  But I'd also like to point out that

18    this is a procedures claim.  The plaintiff has to plead a

19    failure to implement procedures, and a one-off allegation of a

20    failure to honor a stop request is insufficient to show that

21    Rocket Mortgage, as a whole, has failed to implement procedures

22    to maintain an internal do-not-call list.

23          And I'd also like to note that plaintiff points to no

24    authority in his opposition brief showing that his facts here

25    are sufficient, and he pleads no facts about Rocket Mortgage's

1    procedures.  It is fair to say maybe he doesn't know what

2    Rocket Mortgage's procedures are, but the regulation provides

3    him with a right to request those procedures.  Rocket Mortgage

4    has to, on demand, provide its internal do-not-call policy, if

5    asked.  Plaintiff doesn't plead that he did so.  He doesn't

6    plead that he didn't receive it.  So, there's no basis for him

7    to say Rocket Mortgage lacks this procedure.

8         Another point on this is that this was actually

9    evaluated in a prior decision in the Middle District of

10   Florida, and the Middle District of Florida held that Rocket

11   Mortgage has the requisite procedure in place, and plaintiff's

12   response to this is, Well, that was several years ago; it's not

13   relevant.  But it is relevant.  It's relevant to the

14   plausibility of his claim that somehow Rocket Mortgage had the

15   procedure in place, was maintaining an internal do-not-call

16   list.  Why would it no longer have it in place, especially

17   after litigating the issue?

18        THE COURT:  All right.

19        MS. HENNECKEN:  Moving on to the last two counts,

20   Counts Five and Six, these are the New Hampshire State law

21   claims.  So, plaintiff alleges that Rocket Mortgage violated

22   the New Hampshire telemarketing sales call statute, and both

23   these counts should also be dismissed for failure to state a

24   claim based on the plain language of the statute.  To our

25   knowledge, there's no case law, published case law discussing

1    the statute, so we're going off the plain language, and the

2    prohibition at issue states that it applies only to

3    telemarketers making telemarketing sales calls to customers who

4    registered their phone numbers on the National Do Not Call

5    Registry.  And, helpfully, the Legislature did define

6    "telemarketers" and "telemarketing sales calls" and

7    "telemarketing" and explicitly said telemarketing shall not

8    include the solicitation of sales through media other than by

9    telephone calls.

10           So, Count Six is alleging a violation of the statute

11   based solely on the two text messages in March, and the statute

12   says it only applies to phone calls.  So, Count Six at the

13   outset should fail, because the texts aren't governed by the

14   statute.

15           Plaintiff's response to that was, because the TCPA in

16   certain circumstances applies to texts, you should interpret

17   the statute to also apply to texts, but it's just not in the

18   plain language.  There's nothing, no authority or guidance

19   telling us that, especially with this explicit exclusion of

20   other media.

21           And, lastly, with Count Five, the definition of

22   "telemarketing" also states that it means any plan, program or

23   campaign and so on which involves more than five telephone

24   calls per month by a telemarketer in which the customer is

25   located within the state, and, based on the plain language of

1    that statute, that means Rocket Mortgage -- the plaintiff has

2    to allege Rocket Mortgage called him more than five times, and

3    he's only alleged he received four phone calls.  So, based on

4    the plain language of the statute, it doesn't apply here.

5         Plaintiff's point in his opposition is this can't be

6    right; it can't that be Rocket Mortgage can make one call to a

7    bunch of people and not be a telemarketer.  But there's no

8    ambiguity here.  There's no basis for us to deviate from the

9    plain language.  And the Legislature could very easily have

10   said five phone calls to customers in New Hampshire, and it

11   didn't.  It's a singular word, and there's no basis for

12   deviating here.

13        And last point on this:  The definition of

14   "telemarketing sales calls" says it does not include a call

15   made in response to an expressed written or verbal request of

16   the customer.  So, this goes back to our point that the

17   original complaint shows that he made this request.  This is

18   another reason why the statute doesn't govern here.

19        So, in conclusion, the Court should grant our motion,

20   and I believe it should be with prejudice, because plaintiff

21   has already amended, and I don't believe there are any facts he

22   can add to cure the defects here.

23        THE COURT:  Okay.  Mr. Smith.

24        MR. SMITH:  Thank you, your Honor.  I want to start by

25   addressing the initial complaint, and then I'll go into the

1    argument regarding the Motion to Dismiss.  You know, I think

2    the First Circuit was clear in the <u>InterGen</u> case that when an

3    amended complaint supersedes the original complaint and the

4    facts are no longer repeated or otherwise incorporated into the

5    amended complaint they no longer bind the pleader.  Now, the

6    First Circuit did acknowledge that there may be exceptions to

7    that rule, such as when you amend a complaint way later in a

8    case and the other party would be harmed by the amendment of

9    the complaint based on a shift completely in theory.

10           Rocket Mortgage doesn't suffer any harm here because

11   of the amended complaint, because it was Rocket Mortgage that

12   notified us that plaintiff didn't go to this website.  One

13   thing I want to point out is that consumers are at a

14   disadvantage in understanding where telemarketers got their

15   information, however, trying to be forthright, Mr. Daschbach

16   recalled visiting this website, and so he assumed that's where

17   Rocket Mortgage got his information; but counsel has informed

18   us he didn't go to this website, he went to another website,

19   which my client does not have any recollection of visiting, so

20   we removed those allegations and pleaded the amended complaint

21   as is.  So, I do not believe the facts from the original

22   complaint can be considered with respect to the Motion to

23   Dismiss.

24           And the only other point I want to make on that is,

25   regardless of the complaint, in both iterations plaintiff

1    maintains that he did not consent or provide any prior

2    invitation or permission to receive the calls.

3          Jumping into the defendant's arguments with respect to

4    the Motion to Dismiss, I'll just take them in turn, they ask to

5    dismiss Counts One and Two because they claim plaintiff failed

6    to allege sufficient facts regarding the use of an automatic

7    telephone dialing system or an ATDS.  Their argument should be

8    rejected for really two reasons.  First, they read <u>Facebook</u> too

9    narrowly, and they propose an insurmountable pleading standard;

10   and, second, they ignore the allegations that are in the

11   complaint.

12         With respect to the first issue, no party is going to

13   dispute that <u>Facebook</u> is a controlling case and that the

14   Supreme Court's decision represented a shift in how auto

15   dialers are defined.  We do dispute the scope of that ruling.

16   If we just take the definition that the Supreme Court laid out,

17   they held that an automatic telephone dialing system must have

18   the capacity, which is an important word, capacity to either

19   store a number using a random or sequential number generator or

20   to produce a number using a random or sequential number

21   generator.  The reason "capacity" is important is because it

22   doesn't mean the dialing system has to use that function with

23   respect to every call; it just has to have the capacity to do

24   so.

25         Furthermore, "random or sequential number generator"

1    does not refer to -- or does not mean random or sequential

2    telephone number generator.  It refers to the creation of each

3    digit within a number.  If it's read as random or sequential

4    telephone number generator it reads "store" completely out of

5    the statute, because then the number generator would always be

6    producing a number to be called.  So, it's actually referring

7    to the individual digits, which is why systems that can call

8    from a pre-produced list can still be considered an ATDS.

9         And the Supreme Court spoke directly to this,

10   rejecting the defendant's argument.  In Footnote 7 it said, and

11   let me quote here, An auto dialer might use a random number

12   generator to determine the order in which to pick phone numbers

13   from a pre-produced list.  That is exactly what plaintiff

14   alleges happened in this case.

15        And then the other issue with Facebook is it didn't

16   really speak to the pleading standards.  It just issued a

17   decision saying you need to -- any dialer that qualifies as an

18   ATDS must meet this definition.  And so, courts pre Facebook

19   and post Facebook understand that consumers are at a severe

20   disadvantage regarding alleging the technical capabilities of a

21   defendant's dialing system.  In most cases they are treated as

22   confidential, and they have no access to that information, so

23   courts generally asked plaintiffs to allege indirect facts,

24   whether that be the generic content of the message, frequency

25   of the calls, the use of short codes.

1    And this is getting to my second point, is that the

2    defendant ignores all the allegations in the complaint.  So, I

3    think you referred to paragraphs 8, 9 and 10, and those do

4    relate to automatic telephone dialing system claims.  However,

5    we also allege that he received five calls and texts within

6    three days, we allege that all of the texts were received from

7    the short code, and we allege the actual content of the text

8    messages which show that they are general in nature, not

9    specific to plaintiff, and that they had automated response

10   options.  It is these facts that we used to extrapolate to the

11   paragraphs 8, 9 and 10 to suggest that an automatic telephone

12   dialing system was likely used in this case.

13        The issue at the pleadings is plaintiff must rise

14   above a certain level to suggest it to be true, right?  And he

15   has alleged facts that would suggest an auto dialer was used.

16   The decision of whether or not the system actually qualifies as

17   a dialing system is a decision that should be made based upon a

18   complete record.

19        THE COURT:  Okay.

20        MR. SMITH:  With respect to the second argument for

21   the dismissal of Count Three of the complaint, the first DNC

22   Registry claim, the defendant argues that there are no

23   telephone solicitations because the plaintiff provided his

24   consent by releasing his telephone number.  There's multiple

25   issues with this argument, your Honor.  The first, as I already

1    addressed, the initial complaint does not bind plaintiff and --

2         THE COURT:  I think I made up my mind on that.

3         MR. SMITH:  Okay.

4         THE COURT:  I just think the Circuit authority is that

5    at 12(b) I can't rely on it, bottom line.  Now, that doesn't

6    alleviate my concerns, though, about the way this sort of plays

7    out.  And now we have you making certain representations that

8    aren't in the affidavit.  Frankly, I remember a prior

9    litigation with Mr. Daschbach where it was similar what I

10   consider gamesmanship.  So, I think you're right on the law, I

11   do, but I'm concerned about the posture of it, to be honest.

12   We'll have to follow the law and cross that bridge when we come

13   to it.

14        MR. SMITH:  Okay.

15        THE COURT:  You don't need to address the other

16   counts.  You're good.

17        MR. SMITH:  What's that?

18        THE COURT:  You don't need to address the other

19   counts.

20        MR. SMITH:  Oh.  Thank you, your Honor.

21        THE COURT:  Okay, Counsel.

22        MS. HENNECKEN:  I'd like to address a couple of

23   things, if that's all right.

24        So, setting aside the original complaint, I do want to

25   address plaintiff's points about other allegations he made

1    supposedly supporting sufficiency of his pleadings on the ATDS

2    element and the Footnote 7 argument.  I'd like to speak

3    specifically to that language in Facebook's decision.  I think

4    the Ninth Circuit stated it best when addressing this exact

5    argument that you somehow don't have to randomly or

6    sequentially generate the phone number, when it said, This is

7    an acontextual reading of a snippet divorced from the context

8    of the footnote and the entire opinion.  I think the law is

9    very settled that the phone number has to be randomly or

10   sequentially generated.

11          But as to the other facts alleged, plaintiff points to

12   the fact that he received text with a short code and that there

13   were four phone calls and a text within a short period of time,

14   but those elements are actually no longer relevant to pleading

15   whether a random or sequential number generator was used.  In

16   fact, one of the cases plaintiffs cited, Mina versus Red Robin,

17   I believe.  It was a case in the Central District of California

18   that had said using a short code was indicative of an ATDS pre

19   Facebook.  That case was transferred to the District of

20   Colorado, an amended complaint was filed, and post Facebook it

21   was dismissed, so those facts were no longer sufficient.

22          The issue that the Court was concerned about and

23   Congress was concerned about in passing the statute was

24   emergency telephone lines and tying up sequential phone

25   numbers.  It wasn't interested, and the Eight Circuit said this

1    and the Ninth Circuit, in preventing companies from calling

2    consumers who provided their phone numbers or calling people

3    from a list.  That was not the concern here.  And there's no

4    other facts that plaintiff has pled showing that somehow his

5    number was randomly or sequentially generated.  So, for that

6    reason I think plaintiff has failed to state a claim.

7           THE COURT:  Understood.  All right.  I think I'm good.

8    This is a close one.  This is a close one, but I'll get an

9    order out here relatively shortly.  I think -- it wasn't the

10   main focus of anybody's argument, and I didn't really expect it

11   to be, but this question of how I'm supposed to use -- look,

12   the screen shots are much clearer than the video.  It's that

13   simple, you know?  My take on it is that I think in a situation

14   on a motion like this I'm supposed to draw inferences in favor

15   of the nonmoving party both at summary judgment and on a motion

16   to dismiss.  The arbitration is basically on a summary judgment

17   standard.

18          That said, you've clarified for me a couple of

19   misconceptions I had about the video, and you've explained this

20   idea that you think the graphics have been degraded a little

21   bit, and it's not something I can sort of quantify and rely on,

22   but it's something I can at least be cognizant of in my

23   evaluation of the whole thing.

24          All right, everybody.  I appreciate it.  Let's go off

25   the record for a second.

1                    (Discussion held off the record)

2          (WHEREUPON, the proceedings adjourned at 11:25 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   knowledge, skill, ability and belief, a true and accurate

8   transcription of the within proceedings.

9

10

11

12

13   Date: ___7/10/23___        /s/ Brenda K. Hancock
                                Brenda K. Hancock, RMR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25