*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO OCTOBER 26, 2023

```
                      UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE


    * * * * * * * * * * * * * * * * * *
                                      *
RICHARD DASCHBACH, individually and   *
on behalf of others similarly         *
situated,                             *
                                      *  1:22-cv-346-JL
                 Plaintiffs           *  June 30, 2023
                                      *  11:09 a.m.
           v.                         *
                                      *
ROCKET MORTGAGE, LLC, a Michigan      *
limited liability company,            *
                                      *
                 Defendant.
    * * * * * * * * * * * * * * * * * *



              TRANSCRIPT OF DISCOVERY STATUS CONFERENCE
                    HELD VIA VIDEOCONFERENCE
              BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Plaintiff:        Taylor True Smith, Esq.
                          Woodrow & Peluso LLC

                          V. Richards Ward Jr., Esq.
                          Law Offices of V. Richards Ward Jr.
                          PLLC




For the Defendant:        Kyle Tayman, Esq.
                          Goodwin Procter LLP




Court Reporter:           Liza W. Dubois, RMR, CRR
                          Official Court Reporter
                          U.S. District Court
                          55 Pleasant Street
                          Concord, New Hampshire 03301
                          (603) 225-1442
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Good morning, your Honor.
 3              Court is now in session, has before it for
 4    consideration a discovery dispute conference in 22-cv-346-JL,
 5    Richard Daschbach vs. Rocket Mortgage LLC.
 6              THE COURT:  Excuse me, Counsel.  I want to get my
 7    screen straightened out here.
 8              Can everybody hear me okay?
 9              THE CLERK:  Yes.
10              MR. TAYMAN:  Yes, your Honor.
11              MR. SMITH:  Yes, your Honor.
12              THE COURT:  I'm not in the courthouse.  I'm in
13    Washington.  I teach a class down here Fridays and Saturdays
14    this time of year.  So I appreciate your flexibility on
15    scheduling so we can get this resolved.
16              All right.  Just give me a second.
17              Okay.  I've read your submissions.  I think I
18    understand the issues.  I do have some questions, just general
19    questions that anybody can answer, before I sort of get down to
20    brass tacks.
21              The first thing is just the -- the devices involved.
22    Is there agreement on the universe of devices that need to
23    be -- I mean, have there been representations about which
24    devices were used and is the defendant willing to accept those
25    or does he want to cast a wider net?  What's the story on the
```

1   device list?  Just -- if somebody just lists the devices for me

2   first, maybe the plaintiff, that are in play here, it would be

3   helpful.

4           MR. SMITH:  Sure, your Honor.  It's Mr. Daschbach's

5   iPad.

6           THE COURT:  That's it, just the iPad?

7           MR. SMITH:  That's it.

8           THE COURT:  Okay.  I mean -- and so does defense

9   want to settle for just the iPad based on that representation

10  or --

11          MR. TAYMAN:  Yeah.  So, your Honor, there's an iPad

12  and there's a cell phone as well.

13          THE COURT:  Yeah.

14          MR. TAYMAN:  We're looking for whatever devices he

15  used between September and December of 2021, so if it's just

16  the iPad and that's the representation, we'll take the iPad.

17          We understand the cell phone is a flip phone and we

18  said, fine, just tell us it wasn't used to access the Internet

19  and we don't want to look at that.

20          THE COURT:  And that -- was it -- so I guess I'm

21  asking plaintiff's counsel.  The flip phone was not used to

22  access the Internet?

23          MR. SMITH:  No, it's not capable of doing that.

24          THE COURT:  Okay.  So it's just one device.  Okay.

25  Well, that's helpful.  Good.

1            Question two is has Mr. Daschbach been deposed yet.

2            MR. SMITH:  No, your Honor.

3            MR. TAYMAN:  No.

4            THE COURT:  Okay.  Now, what about this issue that

5    the defense basically already has the ability to basically get

6    this information through LMB?  What about that, Counsel?

7            MR. TAYMAN:  Sure.  Glad to speak to that, your

8    Honor.

9            That is factually incorrect.  That is pure

10   speculation.  Notably, plaintiff pulls that from the LMB

11   privacy policy.  He excerpts out some words that are very

12   critical there and if you read the policy for yourself, it says

13   that LMB may collect that information.  It does not say that it

14   does.

15           The information that LMB has is if a consumer goes

16   to their website, goes through the entire flow like

17   Mr. Daschbach did that we know at least two instances and

18   presses the submit button, only if they press the submit button

19   will they get that.  So if Mr. Daschbach went to the website,

20   you know, a hundred times before, after all these visits, they

21   will not know that.  They don't track that information at all

22   in any respect.

23           In particular, you know, even if they could,

24   plaintiff suggests that, well, they've given us his IP

25   addresses and we can use those.  So, again, two problems with

1    that.

2              One, LMB does not track user visits who don't submit

3    information, so the IP address is useless to us; and, two, the

4    IP addresses that plaintiff has provided are his current IP

5    addresses.  They don't match the IP addresses from the two

6    submissions.  So, clearly, his IP addresses have changed over

7    time because it's very easy, anyone can change your IP address

8    at any moment.  So that doesn't help us.

9              It's also possible, some people do this, especially

10   people who file repeat TCPA lawsuits, that you submit different

11   information because you're testing out the lawsuit or whatever.

12   Again, we wouldn't know that.  So the only place that would

13   exist would be on his devices.

14             Now, he also says we might be able to have this

15   information through the Jornaya reports.  I don't know if your

16   Honor is familiar with Jornaya reports.  I'm happy to explain

17   them.

18             THE COURT:  Go ahead.  I have some familiarity, but

19   not like you do.  So, please.

20             MR. TAYMAN:  Sure.  They're a technology provider

21   that groups specifically out of the tidal wave of TCPA

22   litigation that companies were facing in these massive

23   pressures of class actions.  So they offer this technology that

24   you can enter a code on your website and it'll capture a

25   consumer's visit, you see what the consumer types into certain

1    fields, and if they submit -- they press the submission button,

2    then you get a -- you get a replay and a report of that.  So

3    you can see what information the person put in and what pages

4    went in.

5            What you don't see are mouse movements.  So you

6    won't know that.  And you only know that someone clicked on a

7    button because the page will change to the next flow.

8            And, importantly, the Jornaya only captures pages

9    where the code is on that page.  LMB does not put the code on

10   its terms of use or privacy policy.  And for this point and the

11   point I made before, your Honor, we could happily provide you

12   with a declaration from LMB if we need to, but point being if

13   Mr. Daschbach, you know, visited this website in multiple times

14   before or after these visits -- and, you know, we'll get into

15   some other facts that I think are very interesting and suggest

16   that we need to get this inspection to find that out -- LMB

17   wouldn't know that and Jornaya wouldn't capture it.

18           And if you clicked on the terms of use, which is

19   where the arbitration provision was that we previously

20   litigated before you, and he had actual notice, the Jornaya

21   wouldn't capture that as well.

22           So we think there's no other source of information

23   except from his devices, which is why we need the inspection in

24   particular to the extent he's going to continue to dispute that

25   he consented, which is his position in the litigation.

1          THE COURT:  Yeah, it is.  All right.  I had a couple

2    things that raise questions in my mind, but let me let

3    plaintiff's counsel respond to what you just said.

4          I mean, do you not -- he's basically saying that --

5    that LMB and that what is it Joe -- the --

6          MR. TAYMAN:  Jornaya.

7          THE COURT:  The Jornaya, yeah, that neither of those

8    provide him the information he needs.  Do you not accept that?

9          MR. SMITH:  I do not accept that, your Honor.  What

10   he actually just said is where they go through the submission

11   process and click submit, it does record a lot of that

12   information.  He did say that at the beginning there.

13          For both of the visits at issue in this case, he

14   went through and pressed submit, so LMB would have recorded the

15   number of clicks on the site, the date and time stamps, the web

16   pages he visited -- let me look here -- the IP address and the

17   LMB web -- the website also discloses that they record the IP

18   address for each visit, right?

19          So they have all that information when they went

20   through the submission process for both of those visits.

21   Right?

22          They also disclosed that they used the Jornaya

23   visual playback which would show an exact visual representation

24   of going through the process.

25          Now, if he navigated away from that page, there

1   wouldn't be a visual -- there would be a record of -- a break

2   in the visual playback, but that's not present here and they

3   haven't provided any foundation for their support that it is.

4          And I would note that every Internet website,

5   including the subject website, records IP addresses for

6   Internet traffic that goes to the site, including for each

7   page.  They have the IP addresses for the subject dates and the

8   subject time period, yet they've been unable to make any

9   showing that that same IP visited on any other occasion.

10         The standard isn't that there might be information

11  available.  Rocket Mortgage has to substantiate each request

12  that there will be information produced.  And it's a steep hill

13  to climb because it's an extraordinary remedy to access a party

14  opponent's device.  They haven't substantiated their demand

15  that any other visits to the website were ever taking place.

16         They haven't deposed Mr. Daschbach, they haven't

17  issued subpoenas to their Internet providers to see if there

18  were other visits to the website.  They're purely speculating

19  that there are any other visits to the website.

20         And I'd also note that they say the Jornaya Visual

21  Playback won't record the movements or the -- you know, where

22  it's viewed in the website.  Well, I've been involved in a

23  number of these forensic examinations.  Our firm has.  We've

24  never heard defense counsel argue and we've never received an

25  expert opine that through a forensic examination you can tell

1 where a mouse was on a page --

2         THE COURT:  Yeah.

3         MR. SMITH:  -- or where it was viewed.  Right?

4 They're not going to get that regardless.  That's not our

5 burden to disprove; that's their burden to prove that they can

6 get that information.

7         So there's plenty of information that they could lay

8 a foundation, but they haven't laid any foundation for other

9 visits, other visits to similar website, whatever that means,

10 it's not entirely clear, or they haven't provided a single fact

11 to suggest that Mr. --

12         THE COURT:  What -- what that means is whether your

13 client -- you know, let's just cut through it.  It's whether

14 your client's a professional plaintiff on these types of cases.

15 He's trying to find out, you know, and you -- what are you

16 shaking your head about?

17         MR. SMITH:  That's not a defense.  There's a

18 standing defense, but the professional plaintiff argument is

19 not a defense to a TCPA --

20         THE COURT:  Well, it's not a -- it's not a defense,

21 but it goes to the issues that they have to prove in their

22 defense.  That's -- you know, I know it's not a defense.  But

23 it's -- that's -- it seems to me to be discoverable.  But --

24         MR. TAYMAN:  Your Honor --

25         THE COURT:  Go ahead.  Go ahead.

1          MR. TAYMAN:  May I --

2          MR. SMITH:  Sorry.

3          THE COURT:  Wait, wait.  One at a time.

4          Go ahead, plaintiff.

5          MR. SMITH:  Okay.  I just want to point out perhaps

6   they could seek discoverable information in the form of

7   discovery or documents, but they shouldn't be entitled to a

8   forensic examination based on a hunch that he may be setting up

9   lawsuits.  They have to establish facts that he's, in fact,

10  done so before they get to intrude on a party opponent's

11  electronic devices and they haven't produced anything with

12  regard to that fact.

13          MR. TAYMAN:  Your Honor, if I may respond there.

14          THE COURT:  Yes.

15          MR. TAYMAN:  A few things.

16          Mr. Taylor -- Mr. Smith says every -- every Internet

17  provider, every website address, has a list of all IP

18  addresses.  I don't know where that's coming from.  That is not

19  the way LMB works.  Again, happy to substantiate that by

20  declaration.

21          He's very focused on the two submissions.  The

22  problem is his client is denying consent.  So, your Honor, if

23  we just go back to some facts, last time we saw you, you said

24  you were interested in some of the facts here.

25          A couple of things.  He goes to the website the

1   first time on September 13th, 2021.  He submits his

2   information.  Rocket Mortgage calls him that day and says,

3   we're calling about your refinance information requested.  He

4   says, can you send me an email.  Rocket Mortgage says, well,

5   how about if I have someone call you back.  He says okay.

6          We call him the very next day, same conversation;

7   can you send me an email.  He says that a couple times.  The

8   person says okay.  That very day we send him the email.  We

9   have that email from plaintiff's production.

10          Attached to the top of an email is a redaction

11   because he sent it to his attorneys the very same day after he

12   made the submission.  So he was already contemplating this

13   litigation.

14          And I'll get to -- you know, that's irrelevant, but

15   I think the core issue is still on his consent.

16          There's a call the next day, September 15th.  He

17   says, don't call me again.  Rocket Mortgage puts him on its

18   opt-out list, doesn't call him again.

19          He then comes back in December of 2021,

20   December 20th, and consents again.  These are all the facts we

21   laid out in the arbitration.

22          Now, here are the facts as to the lawsuit.  He first

23   files this suit saying these calls resulted from him being to

24   FedRateWatch.org website.  We send him a letter and saying we

25   have no evidence of that, we have evidence twice you consented

1    which forecloses your claims as a matter of law.

2            Instead of engaging with us, he files an amended

3    complaint where he stays completely silent about going to the

4    website at issue, the refinance.enhancedrefinow, except he

5    includes in it three places in three of his six class

6    definitions.

7            When he opposes the motion to dismiss and the motion

8    to compel arbitration, he says, I don't recall going to that

9    website at all.

10           So those were the facts the last time we saw you.

11           We meet and confer in May on this issue of the

12   inspection and he says, well, you don't need it because I'm not

13   going to dispute that I went to the website.

14           Our response was simple:  Is he going to contest

15   that he consented.  Right?  If we get to a jury, we're

16   entitled -- we are going to have to prove that he consented.

17           He says, yes, he's going to contest that.  He's not

18   going to agree that he's consented.

19           So those were -- that was the facts as we understood

20   them up to two days ago when in his submission to your Honor he

21   says he's going to admit that he went to these websites.

22           It can't be the case that we have to go get

23   discovery from him through a deposition, we have to go to his

24   third-party Internet providers to figure out what he did

25   because his story's constantly changing from I'm not going to

1    say anything about the website, I think it was a different

2    website, I don't recall, I'm not going to contest it, to now

3    I'm going to admit I did it.

4            So when we get to trial, if we ever get to a trial

5    of his claims, we're entitled to show a jury not just that he

6    admits he did it, but the proof that he did it; that if there's

7    evidence that he went to the website on other dates and times

8    and was searching around it, was aware of the terms; if he went

9    to other mortgage websites so he understood and knew that if he

10   puts his information out there, the result is I'm going to get

11   calls.

12           That's highly relevant evidence that a jury's

13   entitled to hear and there are -- in his responses to our

14   discovery request, he has told us he does not have records of

15   his Internet history that he can produce.

16           So an inspection may reveal it.  It may not.  So

17   we are willing to engage a forensic examination.  We have

18   addressed all his concerns through the protocol we submitted to

19   your Honor.  It searches five categories of information, just

20   five different buckets.  It is not an all-encompassing search,

21   like plaintiff says.  It is not a multiyear search.  It is

22   limited to a four-month period.

23           It provides plaintiff the opportunity to review the

24   results, to identify anything that's privileged, redact

25   anything, provide us a log, and then we will provide -- give it

1  to us and we even provided the instruction protocol so that any

2  concerns about, you know, his other Internet activities, it's

3  all protected.

4           There's a protective order in this case.  It'll --

5  you know, whatever else he went out there, is not going to get

6  out there.  But we are entitled to know if -- if he's going to

7  contest consent, because it -- quite frankly, unless there's an

8  admission, I don't know how this case goes forward on either of

9  his -- any of his claims known as a class case.  But if he's

10 going to maintain that, we're entitled to get this evidence to

11 prove it.

12          Now, he said a few things about the standard here,

13 your Honor.  This is not an uncommon thing.  He actually quotes

14 a -- in a submission to your Honor he quoted a Sixth Circuit

15 case that, in fact, was misquoted.  He says that the Sixth

16 Circuit said that forensic imaging of electronic devices is not

17 common in the course of civil discovery.  The actual quote is

18 forensic imaging is not uncommon.

19          So this is very routine.  There is no standard that

20 we have to establish the evidence exists before we get the

21 forensic imaging.  He cited one case on that, the *Kalter v.*

22 *KeyFactor* case from the Southern District of California that

23 was sui generis to the holding in that case that the defendant

24 had not made that showing because the defendant was seeking

25 inspection on one issue alone of spoliation.

1          Again, the key issue we're going after here is

2    consent, an issue that he is contesting.

3          Now, I do think the spoliation question is an

4    interesting one that he raises in light of the fact that one

5    day after the first submission, when he's already filed

6    multiple federal civil lawsuits on the TCPA, he's in contact

7    with his attorney.

8          And so it's also relevant, I think your Honor may

9    recall from his other cases, Mr. Daschbach's spent his career

10   as an attorney, so he probably knew about his obligations to

11   preserve evidence.

12         So, you know, that -- I think we're entitled to know

13   while we search for this consent evidence a corollary might be

14   that it's not there anymore; there is nothing there in his

15   Internet history.

16         And, again, I think we're entitled to know that and

17   a jury is entitled to hear that to the extent he's going to

18   keep disputing that he consented to these calls and

19   communications.

20         THE COURT:  So the first you heard that he was going

21   to admit visiting the sites was when we got these discovery

22   submissions?

23         MR. TAYMAN:  Correct.

24         THE COURT:  Oh, I figured that was older information

25   between -- at least between counsel.  All right.

1          MR. SMITH:  Can I respond briefly --

2          THE COURT:  Yeah.

3          MR. SMITH:  -- your Honor?

4          THE COURT:  Go ahead.

5          MR. SMITH:  So we had told them at the conferral

6   that we did not plan to, but Rocket Mortgage delayed providing

7   their document production for 60 days.  We had asked for the

8   information before the visit and they refused to provide them

9   before that.  So we just wanted to confirm it was his

10  information.  It was two days before we submitted or, no, one

11  day before we submitted our submission to you that we actually

12  received that information.  And so at that point we confirmed

13  that we would have acted.  But we had already let them know --

14         THE COURT:  Wait, wait, wait.  What are you saying

15  now, like that the information refreshed his memory?

16         MR. SMITH:  Yes.  Well, we didn't know what the

17  IP -- IP address was other than what was -- we didn't know

18  anything other than what's filed in the motion to compel.  We

19  had asked for the lead information, which is typically provided

20  in these cases.  Rocket Mortgage said, no, we're not going to

21  provide that information.

22         He doesn't have any of his Internet history

23  information from his iPad because iPads delete history after

24  30 days.  So he doesn't have anything from a year and a half

25  ago to be able to confirm that.  Once we, you know, made sure

1    that it's actually his information and wasn't some, you know,

2    information that wasn't provided that was completely

3    inconsistent with what he -- what he would submit, then we

4    clarified that, yeah, we're going to dispute that fact.

5              THE COURT:  Hold on a second.

6              MR. SMITH:  Yeah.

7              THE COURT:  I'm just trying to reread your

8    submission here where you told me -- where you told me you were

9    prepared to admit that he visited the sites.

10             I'm trying to figure out, are you -- so, look, I'm

11   usually frustrated in situations where the plaintiff has part

12   of the burden of proof and the only information that it can get

13   access to to satisfy his burden of proof is usually in the

14   hands of the defendant.  That's a very inconvenient thing

15   sometimes, that defendants frequently drag their feet.

16             This is a situation where the defendant has the

17   burden of proof on something and you're saying, well, they

18   haven't made a showing.  Well, they haven't made a showing

19   because you're dribbing and drabbing the information out to

20   them.

21             And, yeah -- yeah, you are dribbing and drabbing the

22   information out to them.  Suddenly he remembers because they

23   gave you a bunch of -- I mean, I can't tell if you're just

24   prepared to admit that he visited or that he remembers it now.

25   And I just went and looked in your submission and I can't find

1    it, but it's --

2              MR. SMITH:  It's point two, your Honor, the second

3    paragraph.

4              THE COURT:  Hold on a second then.  Wait a minute.

5    The second bullet?

6              MR. SMITH:  Yes, it's the second bullet.

7              THE COURT:  He admits doing so.  Yeah.

8              MR. SMITH:  Yes.

9              THE COURT:  Well, that's not to say that -- I don't

10   know.  Okay.

11             MR. SMITH:  Which is also what we told them during

12   the conferrals and we asked them to serve a request for

13   admission to that fact and we would admit that.

14             MR. TAYMAN:  Your Honor, we were told they weren't

15   in dispute and it can't be that we have to continue to propound

16   discovery for him to avoid an inspection.

17             And on this point about the IP addresses, again, we

18   didn't provide him -- the current IP addresses don't match what

19   we have in our records.

20             And I appreciate he's trying to distract on to us.

21   We never said we weren't going to give our discovery.  We said

22   we'd produce our discovery within 30 days of the entry of the

23   protective order.  We produced our discovery less than 30 days

24   of the entry of the protective order.

25             So it's refresh of -- you know, refreshing his

1   memory and recollection, I think we're entitled to know what

2   other evidence is there and what else is going to refresh his

3   recollection during a deposition.

4               THE COURT:  Yeah.

5               MR. TAYMAN:  And we shouldn't have to take the

6   deposition first, get it, and then come back to you and ask for

7   him to sit again for a deposition.  That's kind of backwards.

8               THE COURT:  I really was thinking about ordering a

9   deposition first, to be honest, I really was, because I

10  thought, well, you know, if you don't get anywhere in

11  deposition, this -- it's a little bit extraordinary to allow a

12  device inspection.  Okay?  I know in these cases it does happen

13  sometimes, but it's not something I'm, you know, eager to

14  order, to be honest.

15              That said -- and I was thinking about I was going

16  to -- I was going to allow you to depose him twice, if

17  necessary, but I wanted you to depose him first to see if this

18  was necessary.

19              But, you know, bottom line is Rocket Mortgage is

20  entitled to discovery to support its defenses.  And because

21  these are defenses that are dispositive of, you know, most of

22  the claims in the case or it might even -- it might even

23  require arbitration again, you know.

24              These are important -- these are -- this is

25  important information and I don't know how else you can get it.

 1   And I don't think you should have to make a showing to get the

 2   information, especially given the track record of what's

 3   happened here.

 4          So what I'm going to do is I am going to order this

 5   discovery but under the -- like under the narrowed protocol

 6   that Rocket Mortgage has -- well, that they offered in the

 7   confer that didn't -- that didn't fly.  That's what I'm going

 8   to order, though.  All right?

 9          I'm -- you know, I just think that -- I think

10   they're entitled to discovery and I don't think there's a

11   better way of doing it, given -- given the situation now and

12   what we do know and the track record leading up to here.

13          So that's going to be the ruling.  I'll get a little

14   order out to you within a couple of days here, but -- if you

15   want it.  But what it's going to say is that -- that I -- I

16   have it here in the submission from Rocket that it's going to

17   be along the lines of that protocol.

18          And -- and Mr. -- Mr. Smith's going to get a chance

19   to inspect it and do a -- and claim privilege and the like or

20   claim any kind of nondisclosure before it gets produced to

21   defense counsel in this case.  All right?  So --

22          MR. SMITH:  Your Honor, could I just address one

23   point quickly?

24          THE COURT:  Yes, of course.

25          MR. SMITH:  So in the requested protocol, it differs

1    slightly from what they submitted in their bullet points.  It

2    appeared that they were dropping to the Court their request to

3    inspect the device for spoliation.

4          And I would point out that courts are definitely in

5    agreement that you don't get to inspect a party opponent's

6    device for spoliation unless you make a foundational showing

7    that there was relevant information destroyed and it was done

8    so with a culpable mind.

9          So I would just ask that that portion be taken off

10   if the Court's going to order an inspection with respect to the

11   bullet points that were submitted to the Court.  We don't think

12   there's a basis to inspect the device for spoliation.  That's

13   my only point there.

14         THE COURT:  What's your position on that, Counsel?

15         MR. TAYMAN:  Yeah.  Your Honor, we didn't limit the

16   protocol in what we submitted to the Court.  We submitted the

17   full protocol.  That's what we're asking for.  Plaintiff had --

18   you know, has had weeks to provide us a counterproposal to

19   engage us on his concerns.  We had to take this all

20   affirmatively.  We've engaged a forensic examiner who, if we

21   need to, he will come to Mr. Daschbach's house, take the device

22   for as short time as he needs for a few hours.

23         What is relevant, though, if there's nothing there

24   and they can find that there was information there, in

25   particular given his statements to the Court, his admissions

1   that he did not recall, I think that's highly probative of what

2   was going on if he can't recall what was going on in this time

3   period, in particular when we get to the deposition and ask

4   about what are the mortgage sites he was going to, was there

5   information, was there not.

6          THE COURT:  Well, the assertion of -- the assertion

7   of the inability to recall is important to me, it's not

8   because -- it's not just because I'm suspicious of it.  I mean,

9   there's two ways to look at it.  One is that the inability to

10  recall these type of details could mean that there's other

11  things he's forgotten, like other IP addresses and other things

12  like that that are going to be -- or other conduct that's going

13  to be important information in the case.

14         That's a -- and that's if the assertion of a failure

15  to recall is a truthful one.  Right?  It -- it casts -- it

16  casts, you know, his recollection into doubt and that requires

17  more digging and, of course, if it's not a truthful assertion,

18  that's another problem.  But either way, I think it supports

19  the order for discovery.

20         But I'm not -- I guess I didn't understand your

21  point, Counsel, when it comes to -- how does that respond to

22  Mr. Smith's argument about spoliation?

23         MR. TAYMAN:  Your Honor --

24         THE COURT:  Go ahead.

25         MR. TAYMAN:  Sure.  This issue here is preservation,

1   your Honor.  Right?  And the device will show that.  If it's

2   the case that his device settings -- you know, everyone can

3   address their iPad differently, but if his case was it was --

4   his device settings were set up to clear history in 30 days,

5   that's fine.  We're entitled to know that.

6            Whether or not we make a spoliation issue --

7   argument, that's an issue for later.  But if we can't get the

8   evidence in the first place to understand if there's history

9   there or not, and if there's not why not, then we're not even

10  able to explore that, whether it was something that under his

11  obligations when he was in active litigation in other lawsuits

12  and when he was communicating with his counsel one day after

13  the submission, you know, what he did and what his duties were

14  and what his obligations were.

15           THE COURT:  Okay.  Okay.  I get it.  All right.

16           Anybody else want to say anything else before we

17  wrap up?

18           MR. TAYMAN:  Nothing from Rocket Mortgage, your

19  Honor.

20           THE COURT:  All right.

21           Mr. Smith, anything?

22           MR. SMITH:  No, your Honor.

23           THE COURT:  All right.

24           Nick -- anything, you know, I haven't covered you

25  wanted me to cover, Nick?

```
 1                    THE LAW CLERK:  (Shakes head.)

 2                    THE COURT:  Okay.  Okay then.

 3              Look for an order shortly.  I appreciate your

 4   submissions here and we'll get a -- an order out to you, you

 5   know -- well, I want to say early next week, but with the

 6   holiday it might intervene.  But you know what's coming, so you

 7   may as well start getting ready.  Okay?

 8                    MR. TAYMAN:  Thank you, your Honor.

 9                    MR. SMITH:  Thank you.

10                    THE COURT:  All right, Counsel.

11              Hey, can -- can -- can Nick and Evan stay on the

12   Zoom call with me for a first minutes here?  You guys can --

13   counsel can exit.

14                    MR. TAYMAN:  Thank you.

15                    (Proceedings concluded at 11:37 a.m.)

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


      I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 7/28/23         */s/  Liza W. Dubois*
                        LIZA W. DUBOIS, RMR, CRR